THE OCEAN BEACH ASSOCIATION et al.

*v.*

ANDREWETTA S. BRINLEY.

1. Dower, when founded on a legal seizin, is a pure legal right, and while courts of equity have concurrent jurisdiction with courts of law of suits for dower, yet, when no equitable principle is involved, they govern themselves by the same rules which control courts of law.

2. In such cases, a court of equity will not try a question of legal title; if the dowress comes to equity, in the first instance, for a remedy, and the de-

Ocean Beach Association *v.* Brinley.

fendant denies her legal right, equity will defer giving her relief until the question of title is determined at law.

3. If A agrees with B to purchase land for him, and have it conveyed to him, so that A is not the vendor, but a mere intermediary between the vendor and B, and A afterwards takes title in his own name, he will hold the land as trustee of B, and A's widow will not, in equity, be entitled to dower.

4. But, in such case, B can only defend successfully by resorting to the aid of a court of equity.

5. The first requisite of a good custom is that it shall have been used so long that the memory of man runneth not to the contrary; customs, therefore, like those of gavelkind and borough-English, cannot prevail here, for they cannot have the requisite antiquity to give them validity.

6. Common error sometimes passes as law, but no error can be raised to that dignity until it has been declared to be law by a judicial tribunal of superior jurisdiction, and is afterwards so far adopted as law, in practice, as to render a return to the true rule of law destructive of existing interests.

---

On motion for an injunction, heard on bill and affidavits and answer and affidavit.

*Mr. John H. Stewart* and *Mr. Barker Gummere,* for complainants.

*Mr. Cortlandt Parker,* for defendant.

VAN FLEET, V. C.

The object of the bill in this case is to have the defendant restrained from further prosecuting certain actions at law, which she has brought against the complainants to recover dower in certain lands, which, during coverture, were conveyed by her husband, by a deed in which she did not join, to seven persons under whom the complainants claim. The grounds mentioned in the bill, upon which the interference of the court is asked, are very numerous, but only two or three of them, in my judgment, possess sufficient substance to merit either consideration or mention.

Dower, when founded on a legal seizin, is a pure legal right, and while courts of equity possess concurrent jurisdiction with courts of law for its enforcement, yet, in cases where no equitable

principle is involved, they uniformly treat the widow's dower as a strictly legal right, and, in dealing with it, govern themselves by the same principles which control courts of law. *Scrib. on Dow. 153.* So strict are they in adhering to this course of procedure, that it may be said to be their invariable rule that, even in cases where the dowress comes, in the first instance, to them for a remedy, if her right, as a matter of law, is denied, relief will be deferred until her legal right has been vindicated by a judgment at law. *Hartshorne* v. *Hartshorne, 1 Gr. Ch. 349; Swaine* v. *Perine, 5 Johns. Ch. 482; Badgley* v. *Bruce, 4 Paige 98; D'Arcy* v. *Blake, 2 Sch. & Lef. 387; Rockwell* v. *Morgan, 2 Beas. 384.*

Chancellor Green, in the case last cited, said :

" This court clearly cannot try or decide a question of legal title, nor decide whether a widow is legally entitled to dower when her legal right is denied. If the defendant denies the complainant's right to dower, the question must be tried at law."

The main ground upon which the complainants base their right to an injunction is, that the defendant's husband was never seized of any estate or interest in the lands in controversy, in his own right, but acquired title to them for the use and benefit of the persons under whom they claim, and held them simply as their trustee. If this contention is found to be true, it must be conceded that the defendant is not entitled to dower; for I think there can be no doubt about the soundness of this proposition : that if A agrees with B to purchase land for him, and have it conveyed to him, so that A is not the vendor, but a mere intermediary between the vendor and B, and A afterwards takes title in his own name, that he holds the land as the trustee of B, and that A's widow will not be entitled to dower, according to well-settled rules of equity. I think it must also be conceded that in such case, B's defence to an action at law by A's widow could only be successfully made in equity. The soundness of the principles upon which the complainants found their right to an injunction must be admitted, and the court need, therefore, concern itself with nothing but the question of fact.

The lands in controversy were held by the proprietors of the eastern division of New Jersey, as part of their joint property, up until December 2d, 1861. The answer avers that on that date a return was made to the surveyor-general, showing that they had been surveyed for Edward Brinley, under a warrant issued May 17th, 1859, authorizing him to locate and have set off to him, in severalty, seven thousand acres of the common property. This return was duly recorded in the office of the surveyor-general, at Perth Amboy, April 24th, 1862, and is the only return or survey of the lands in controversy now shown to be in existence. Edward Brinley was the husband of the defendant, and it is upon his seizin she founds her claim of dower. He died intestate February 14th, 1867. His father, Francis W. Brinley, was a member of the council of proprietors of the eastern division of New Jersey, and also their surveyor-general. He died May 1st, 1859. Edward afterwards took his place in the council of proprietors.

It is quite impossible to deal intelligently with the facts of this case without first understanding the method by which lands held by the proprietors were partitioned. That proceeding is thus described by Chief-Justice Kirkpatrick, in *Arnold* v. *Mundy, 1 Hal. 1, 67 :*

"The proprietors of East Jersey are tenants in common of the soil ; their mode of severing this common estate is by issuing warrants, from time to time, to the several proprietors, according to their respective rights, authorizing them to survey and appropriate, in severalty, the quantities therein contained. Such warrant does not convey a title to the proprietor ; he had that before ; it only authorizes him to sever so much from the common stock, and when so severed by the proper officer it operates as a release to him for so much. This is the case when the proprietor locates for himself. When he sells his warrant to another, that other becomes a tenant in common with all the proprietors *pro tanto*, and in the same manner he proceeds to convert his common into a several right. Regularly there is a deed of conveyance, upon the transfer of this warrant, for so much of the common property, and that deed and the survey upon the warrant is the title of the transferee."

Judge Elmer, in his valuable note on the sources of title to land in this state, appended to the act making provision for the safe keeping of the records of the surveyor-general's office (*Nix.*

*Dig. 935*), gives substantially the same description of the method of procedure.   He says :

"Titles in West Jersey [and he subsequently states the same course was pursued in East Jersey] are derived from some one of the original proprietors.  Regular deeds of conveyance were made (formerly by lease and release, in modern times by deeds of bargain and sale) either of a fractional part or of a specified number of acres.  A proprietor, or a grantee under him, upon presenting his title to the council, obtains an order for a warrant, which is signed by the clerk and recorded, and which authorizes the surveyor-general or his deputy to survey a specified number of acres from any of the unappropriated lands.  By virtue of this warrant, a deputy surveyor, who is a sworn officer, runs out a survey including any number of acres not exceeding the number specified, as the owner chooses to have it, wherever it is supposed other surveys do not cover the ground.  The deputy having returned his survey, reciting the warrant and the deductions of the title, with a map, he certifies it to the council, and being by them inspected and approved, it is ordered to be recorded."

These citations show very clearly in what manner the proprietary lands were held originally, and the course which must be pursued to acquire title to them.

The complainants claim title under four fishermen, named as follows : John Brown, Isaac Newman, Garret S. Newman and Stephen Bennet.   Three of these persons have made affidavits in this case—the fourth is dead—and their story presents the first ground upon which the complainants rest their claim to an injunction.   They say, some time between 1850 and 1855, Annaniah Gifford, a deputy surveyor of the council of proprietors, was surveying land in the neighborhood in which they lived ; that they made inquiry of him at what price land could be obtained of the proprietors ; two say he replied that they could get it at $1 an acre, but the other says he said $1.25 an acre ; they then say they requested Gifford to survey the lands for them, and that he did so.   One says Gifford told them, when the survey was completed, or shortly afterwards, that the survey embraced ninety-one or ninety-two acres ; another says that he thinks the survey embraced about seventy-five acres, and the third says he does not remember how many acres it embraced. They further say that after the survey was completed, they told

Gifford to take up the land for them, and to do whatever was necessary to get the title of the proprietors.   One says that Gifford kept the survey; another, that they told Gifford to send it to the surveyor-general; and the third, that he does not know what was done with it.   They took possession, they say, shortly after the survey was made, by direction of Gifford, and made some improvements on the land, but they admit they were accustomed to spread their nets on the land before the survey was made.   Isaac Newman says that Gifford told him some time after the survey had been made, that the survey had been altered at the office by the addition of ten or twelve acres.

Affairs seem to have remained in this condition until 1859. John Brown says, some time after the survey was made—he does not attempt to fix the time with any greater certainty—Gifford again came to their neighborhood to survey, and he then told them that old Mr. Brinley wanted them to make a payment on the land, and they gave him $35, for which he subsequently brought them a receipt.   This receipt is set out in the bill, and is in these words :

                              " FREEHOLD, December 2, 1859.
"Received in part payment for a tract of land of A 92 in Wall township,. on the ocean, $35.                              EDWARD BRINLEY."

They say the next thing they heard was that old Mr. Brinley was dead, and that the matter had fallen into somebody's else hands, but whose they do not remember.

It is perhaps important to remark just here, that Francis W. Brinley, the person called old Mr. Brinley, died May 1st, 1859,. some seven months before the date of this receipt.   It is quite probable, therefore, that information of his death had reached these persons before they made this payment.   That payment seems to have been made very soon after they were informed it was required.   Gifford was in their · neighborhood surveying when he notified them it was required.   They say they raised $35 and gave it to him.   The inference is almost unavoidable that they gave him the money while he was there in their neighborhood on that occasion.   Unless we presume that Gifford

withheld the money from the person entitled to it for over seven months after he received it, it is impossible to believe that these persons were not informed of Francis W. Brinley's death before they made the payment of $35. No such presumption can be made in the face of the character these fishermen have ascribed to Mr. Gifford.

But to resume. They further say that, shortly after Gifford told them that old Mr. Brinley was dead, he informed them that another payment was required; he did not say by whom it was required, but they supposed by some one of the proprietors. The money was raised, and Gifford and Stephen Bennet carried it to Freehold and paid it to Edward Brinley. A receipt for it was written on the same paper containing the receipt dated December 2d, 1859, and read as follows:

> "FREEHOLD, September 4, 1860.
> "Received on the above from Mr. A. Gifford, $77.
> "EDWARD BRINLEY."

The next thing they remember, they say, is a letter written by Edward Brinley, requesting them to meet him at Freehold and to pay the balance of the purchase money and get their deed. John Brown and Isaac Newman met Brinley at Freehold. Brown says they said to Brinley that they had expected to get the land for $1.25 an acre, as Gifford had told them they could get it of the proprietors for that price; to which Brinley replied that land had gone up, and was then worth $3 an acre; but, inasmuch as they had had their survey made some time before, he would let them have it for $2.50 an acre; while Newman says he asked Brinley how it was that he charged them $2.50 an acre, when Gifford had told them they could take up the land for $1 an acre, and that Brinley replied that land had gone up since he had located that which they were getting. They then paid Brinley the balance of the purchase-money and he delivered to them a deed, executed by himself alone, bearing date December 12th, 1861. The deed contains this important covenant, namely, that the land conveyed by it had been duly

Ocean Beach Association v. Brinley

located on a proprietary right of location, which Brinley bound himself to forever defend.

It is clear that the court can extend no aid to the complainants unless the facts thus adduced show clearly and satisfactorily that Edward Brinley held the lands in question, not in his own right, but as trustee. Their effort is to show a trust by proof of a parol contract made more than twenty-five years ago, and this they attempt to do, in spite of the fact that almost every writing made by the alleged trustee, in relation to the subject of the trust, denies the trust. The deduction they seek to have made from the narrative of the three fishermen is, that at some time between 1850 and 1855, Brown, the two Newmans and Bennet made and completed with Francis W. Brinley a contract for the purchase of the lands in controversy, and that Edward Brinley subsequently obtained title to the lands with notice of the rights of the prior purchasers. Unless such prior contract has been established, by convincing legal proof, there is no pretext for the claim of trust set up by the complainants. It is undoubtedly true that as soon as an agreement for the sale of land is made, the vendor becomes the trustee of the legal estate for the vendee, and the vendee is put in a reciprocal position in respect to the purchase merely, and if the vendor subsequently conveys the land to some other person than his *cestui que trust*, with notice of the prior contract, such person will take subject to the trust existing in favor of the first purchaser, and may be compelled to convey to him. Now, has a contract with Francis W. Brinley been proved? I think not. I think it is very clear that the only contract the fishermen ever made concerning the lands was made with Edward W. Brinley. That is what the receipts and deed say. The evidence they give is much more trustworthy than mere human recollection, which time obscures, interest warps and age obliterates. Now, what is proved? I think there is no reason to doubt that the four fishermen had Gifford to make a survey, but not of all the lands in controversy. His survey was, however, wholly unauthorized. He had no warrant. Without that, he could not act for the proprietors. I think it is also true that the fishermen requested Gifford to take up some

lands for them, but I am also convinced that he informed them at the same time, that in order to make the survey of any avail to them, they must purchase a proprietary right and procure a warrant to locate.

Even if it be conceded that Gifford's survey was delivered to the surveyor-general, we do not advance a step towards showing a contract. Until the fishermen were the owners of a proprietary right and were armed with a warrant to locate, a survey of these lands could have no more force as proof of a contract of purchase, than a survey of any of their neighbor's lands. And even it be admitted that Francis W. Brinley directed Gifford to tell the fishermen that he wanted them to make a payment on the land, still that, standing alone, does not prove a contract. He may have known that they had had the land surveyed, and had expressed a wish to purchase, but they had proceeded no further. They had suffered four or more years to elapse without doing anything more. I do not regard their possession as a matter of much consequence. I think they enjoyed the use of the land quite as much before the survey as afterwards. In this condition of affairs, Mr. Brinley may have thought it but just to warn them that if they desired to purchase they must do something besides express a wish. The uncertainty overhanging the date of the survey—it will be observed it has been left to oscillate anywhere between 1850 and 1855—and then the long lapse between the date of the survey and the time of the first payment, tend very strongly, I think, to show that neither party thought or understood it was bound in any way to the other.

So far, the declarations which the three fishermen have put in Gifford's mouth, have been treated as competent evidence, but it is manifest they are not. He was a deputy surveyor, and as such had authority to survey unappropriated lands under warrants issued by the council of proprietors, but he was neither officer nor agent for any other purpose. He had no authority to make contracts for the council of proprietors, nor for any of their members. At least no such authority is shown. His declarations, therefore, were mere hearsay, possessing absolutely no force whatever as evidence. Expelling from the complainants' case this species of proof, there is nothing left which will justify even

a conjecture that a contract existed between Francis W. Brinley and the fishermen.

The second ground upon which the complainants insist that they are entitled to the aid of the court is that, by a long-established and universally-recognized custom, the widow of a proprietor is not entitled to dower in lands held by him in severalty under the council of proprietors. The citations already made show that a survey duly made under a warrant to locate, returned and recorded, operates as a release, and effects a complete severance of the lands surveyed from the common stock. The third section of the act of 1787 declares that after a survey has been duly entered of record, in the proper office, it shall preclude and forever bar the proprietors and their successors from any demand on the lands therein embraced, any plea of deficiency of right or otherwise notwithstanding. *Rev.* 599. An investiture of title effected by warrant, survey and return entered of record would seem to be as perfect as law can make it. A proprietor, holding land by a title thus created, is unquestionably seized of an estate of inheritance therein, and his widow, by the plain letter of the statute, is dowable thereof. It is not debatable that the custom avouched by the complainants stands in direct conflict with our statute. That enacts that a widow shall be endowed of the third part of all lands whereof her husband, or any other to his use, was seized of an estate of inheritance, at any time during coverture, to which she has not released her right. So far as I am aware, no trace of this custom can be found in either the legislation or judicial decisions of this state. It is not pretended that it has ever been recognized, directly or indirectly, by either the judiciary or legislature. An attempt has been made to prove it by proof of common understanding and the practice of conveyancers. One gentleman swears that he has examined the record of over five hundred deeds recorded in Monmouth county, made by three different proprietors, for lands held by them in severalty, and found but one instance in which a wife had joined in making title. Whether they all had wives at the several times when these deeds were made, he does not know; but he does state that it was the common understanding among surveyors and persons

engaged in real estate transactions, that the signature of the wife was not necessary to pass lands held by a proprietor, free of dower. Another gentleman, who says he has been a deputy surveyor since 1843, swears that it has never been considered that the wife of a proprietor was entitled to dower in the lands which her husband held in severalty, under the council of proprietors, and that he has never known an instance in which the wife of a proprietor has joined in a conveyance of such lands. This is the whole of the evidence offered to prove this custom. It is hardly necessary to say that it is utterly insufficient. The first requisite of a good custom is that it shall have been used so long that the memory of man runneth not to the contrary. For which reason no custom can' prevail against an express act of parliament, since the statute itself is a proof of a time when such custom did not exist. *1 Blk. Com. 76; Bac. Abr. tit.* *" Custom " A.* Customs similar to those of gavelkind and borough-English, cannot exist here, for they cannot have the antiquity necessary to their validity. To be recognized by the courts, they must have existed immemorially, that is, before the beginning of the reign of Richard the First. This country was not discovered until more than three hundred years after the commencement of that sovereign's reign, and consequently no custom can have existed here for the period required to make it legal. *Ackerman* v. *Shelp, 3 Hal. 125; Allen* v. *Stevens, 5 Dutch. 509.*

But the complainants insist that if the practice cannot have effect as a custom, it should nevertheless be held effectual to bar the defendant's claim in virtue of the maxim, *communis error facit jus.* This, though an admitted legal maxim, is seldom applied in the administration of justice, and never without the utmost caution. The reason is obvious; it permits a misconception to become law in destruction of the real law of the case. In my judgment, no error should be allowed to possess that degree of dignity and force until it has been sanctioned by a tribunal of superior jurisdiction, and subsequently treated as law in the actual business affairs of men. The true rule I believe to be this: That no error is entitled to

be accepted as law by the courts, until it has been declared to be law by a competent judicial decision, and afterwards so far adopted in practice that a return to the true law would seriously impair existing interests. In *O'Connell* v. *Queen, 11 Cl. & Fin. 373*, Lord Denman said:

"When, in pursuit of truth, we are obliged to investigate the grounds of the law, it is plain, and has often been proved by recent experience, that the mere statement and restatement of a doctrine—the mere repetition of the *cantilena* of lawyers—cannot make it law if it be irreconcilable with some clear legal principle."

And Lord Brougham, in *De Vaynes* v. *Noble, 2 Russ. & Myl. 506*, said:

"Common or universal error may be said to make the law, especially if the opinion of lawyers and the decisions of judges have been ruled by it."

Justice Blackburn says, in *Jones* v. *Tapling, 12 C. B. (N. S.) 846*:

"There are cases in which a decision originally erroneous, has been so long acquiesced in and acted on, that a return to the proper principle would greatly affect existing interests. This is peculiarly the case in questions of conveyancing law. In such cases the maxim *communis error facit jus* may be applied."

The error approved in *Morecock* v. *Dickins, Amb. 678*, was one that had been sanctioned by a prior adjudication. So, too, in *D'Arcy* v. *Blake, 2 Sch. & Lef. 387*, the error approved by Lord Redesdale was one which prior decisions had made law. He said:

"The decisions to the full extent are so old, so strong and so numerous, so adopted in every book on the subject, and so considered as settled law, that it would be very wrong to attempt, at this time, to alter them."

In my opinion, there is no evidence whatever, in this case, that the error which the complainants insist shall have the force of law, has ever been recognized or applied by any authority competent to give it the force of law.

A third ground on which the interference of this court is asked, is, that full and complete justice cannot be obtained at law. The complainants say that in consequence of the division

of the lands in controversy into many small parcels, and the conveyance of many of them to different persons, and the fact that many of the tracts so conveyed have been improved by the erection of costly dwellings and large expenditures for ornamentation, equities have arisen in favor of the persons making these outlays which a common law court can neither recognize nor protect. Whether or not the bill avers these equities with sufficient certainty to present a case for relief, is a question which I think should not be considered at this time. The defendant's right to dower has not yet been adjudicated. Her right is not admitted; on the contrary, the complainants deny her right. Her claim is based on a legal right. She has a right to choose the forum which shall determine her legal right. After her right to dower has been established at law, if it should appear that its enforcement according to legal methods will be attended with serious injustice, it may then be the duty of this court, upon a proper case being presented, to consider whether or not equitable relief can be given. But at this juncture it is clear to my mind that this court ought not to pass upon that question.

I am of opinion the case presents no ground for the interference of this court. An injunction must therefore be denied, and the order to show cause discharged, with costs.